1  JP LAW
   Laura Furuta, Esq. [State Bar Number: 210198]
2  28484 Constellation Road
   Valencia, California 91355
3  Telephone: (661) 505-1188
   Facsimile: (661) 607-0199

4
   Attorney for Plaintiff
5  Rosaura Frias

6

7                 **UNITED STATES DISTRICT COURT**

8           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9

10 ROSAURA FRIAS, an individual            Case No.: 3:13-CV-00075-EDL

11        Plaintiffs,

12                                         **PLAINTIFF'S OPPOSITION TO**
                                           **DEFENDANT WELLS FARGO'S MOTION**
13     vs.                                 **TO DISMISS THE COMPLAINT**

   WELLS FARGO BANK as successor by
14 merger to Wachovia Bank and World Savings
   Bank; CAL WESTERN RECONVEYANCE
15 COMPANY and DOES 1 – 20, inclusive

16        Defendants.                      *Honorable Elizabeth D. Laporte*

17

18

19        Plaintiff Rosaura Frias ("Plaintiff") hereby submits her Response and Opposition to

20 Defendant Wells Fargo's, (hereinafter "Defendant") Motion to Dismiss.

21              **MEMORANDUM OF POINTS AND AUTHORITIES**

22                       **I.      INTRODUCTION**

23     This action arises out of Defendant's past and ongoing unlawful, unfair, and fraudulent

24

25 business practices relating to their lending, servicing and foreclosure of real estate properties.

26     Plaintiffs obtained a loan to finance their home. In connection with that transaction, Plaintiffs

27 executed a promissory note (the "Note"), which had terms that either were suppressed or

28 knowingly and affirmatively misrepresented. Each Defendant either benefitted, or is intending to

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

benefit, from this undertaking. In addition, Defendant operates a complex wrongful foreclosure scheme which uses misleading, fraudulent tactics to victimize hundreds, if not thousands, of consumers throughout the State of California. Many consumers have already lost their homes to foreclosure, or face default, foreclosure, and the loss of their homes as a direct result of these practices.

## II.    LEGAL SUMMARY

Defendant argues that the majority of Plaintiff's claims fail because claims are time barred, and if not time barred, the allegations are false or insufficient. To the contrary, Defendant's arguments supporting its motion should fail because, as fully set forth below, the Complaint alleges facts sufficient to maintain each cause of action presented therein.

Furthermore, the Complaint is certain with respect to all elements plead. Thus, Defendant's Motion to Dismiss should be denied in its entirety. Alternatively, if the Court finds that one or more causes of action are not properly plead, Plaintiffs respectfully request leave of court to amend the Complaint to cure any defects.

## III.    APPLICABLE STANDARDS ON MOTION TO DISMISS

A Rule 12(b)(6) dismissal for failure to state a claim can be based on either: (1) the lack of a cognizable legal theory; or (2) insufficient facts to support a cognizable legal claim. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) will not be granted unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Perfect 10, Inc. v. Vista Int'l Serv. Ass'n, 494 F.3d 788,794 (9th Cir. 2007). Plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007). Those facts must be sufficient to push the claims "across the line from conceivable to plausible[.]" Ashcroft v. Iqbal, --- U.S. ---, 129 S.Ct. 1937, 1951 (2009) (quoting Twombly, 550 U.S. at 557). In deciding a Rule 12(b)(6) motion, the court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold and Easement in the

1  Cloverly Subterranean, Geological Formation, 524 F.3d 1090, 1096 (9th Cir. 2008). The court is

2  to "accept all factual allegations in the complaint as true and construe the pleadings in the light

3  most favorable to the nonmoving party." Outdoor Media Group, Inc. v. City of Beaumont, 506

4  F.3d 895, 899-900 (9th Cir. 2007). If the complaint is dismissed, plaintiff generally should be

5  afforded leave to amend unless it is clear the complaint cannot be saved by amendment. See

6  Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

7      The issue presented by such a motion is not whether the plaintiff will prevail in the action,

8  but whether the plaintiff is entitled to offer evidence in support of its claims. *See* Scheuer

9  v.Rhodes, 416 U.S. 232, 236 (1974), *overruled on other grounds*, Davis v. Scherer, 468 U.S. 183

10  (1984).

11      The court must construe the complaint in the light most favorable to the plaintiff, accepting

12  all well-pleaded factual allegations as true and drawing all reasonable inferences in plaintiff's

13  favor. Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336,337-38 (9th Cir. 1996); Usher v. City of Los

14  Angeles, 828 F.2d 556, 561 (9th Cir. 1987). Courts must assume that all general allegations

15  embrace whatever specific facts might be necessary to support them. Peloza v. Capistrano

16  Unified Sch. Dist., 37 F.3d 517, 521 (9th Cir. 1994).

17      If the Court dismisses any claim for relief, it must then consider whether to grant leave to

18  amend. The Ninth Circuit has repeatedly held that a district court should grant leave to amend

19  even if no request to amend the pleading was made, unless it determines that the pleading could

20  not possibly be cured by the allegation of other facts. Lopez v. Smith, 203 F.3d 1122, 1130 (9th

21  Cir. 2000) (citation and quotation marks omitted).

22  **A.      Discovery Rule Postpones Accrual Of Cause Of Action.**

23      The discovery rule postpones accrual of a cause of action until the Plaintiff discovers, or has

24  reason to discover, the cause of action. Nogarat v. Upjohn Co. (1999), 21 Cal.4th at p. 397, [87

25  Cal.Rptr.2d 453, 981 P.2d 79].

26      When Plaintiff reasonably should have discovered facts for purposes of the accrual of a cause

27  of action or application of the delayed discovery rule is generally a question of fact, properly

28  decided as a matter of law only if the evidence can support only one reasonable conclusion. Jolly

1   v. Eli Lilly & Co. (1988), 44 Cal.3d at p. 1112, [245 Cal.Rptr. 658, 751 P.2d 923]. Therefore,

2   issue of statute of limitation cannot be resolved on the demurrer. Similarly, "[w]hether reliance

3   [on a misrepresentation] was reasonable is a question of fact for the jury, and may be decided as

4   a matter of law only if the facts permit reasonable minds to come to just one conclusion."

5   Grisham v. Philip Morris U.S.A., Inc., 40 Cal.4th at p. 637, italics omitted; accord, Alliance

6   Mortgage Co. v. Rothwell (1995) 10 Cal.4th 1226, 1239 [44 Cal. Rptr. 2d 352, 900 P.2d 601].

7        In actions where the discovery rule applies, the limitations period does not accrue until the

8   aggrieved party has notice of the facts constituting the injury. Fox v. Ethicon Endo-Surgery, Inc,

9   (2005) 35 Cal.4th at p. 807, [27 Cal. Rptr.3d 661, 110 P.3d 914]. The discovery rule "is based on

10  the notion that statutes of limitations are intended to run against those who fail to exercise

11  reasonable care in the protection and enforcement of their rights; therefore, those statutes should

12  not be interpreted so as to bar a victim of wrongful conduct from asserting a cause of action

13  before he could reasonably be expected to discover its existence." Saliter v. Pierce Brothers

14  Mortuaries (1978) 81 Cal.App.3d 292, 297, 146 Cal.Rptr. 271.

15       In this case, statute of limitations should be tolled because Plaintiff did not become aware of

16  the fraud until they retained the services of their attorney. Plaintiff alleges that at the time of

17  execution of the mortgage documents, Plaintiff did not have any reason to suspect that there were

18  misrepresentations and fraud because he relied on the representations of Defendants. The reason

19  Plaintiff did not discover the misrepresentations was because of the complexity of the loan

20  documents and misleading disclosures. The misrepresentations included but not limited to: a

21  variable interest rate, low initial teaser rate concealing an exorbitantly high interest rate, a

22  interest only payments, exorbitant costs and fees. Due to Plaintiff's lack of knowledge of

23  professional finance terminology and, above all, his limited understanding of the English

24  language, he did not understand the true terms of the loan.

25       ///

26       ///

27       ///

28       ///

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

1    In applying discovery rule it is also important to recognize the distinction between cases

2    where a Plaintiff under a duty to inquire and those in which he had no such duty until he had

3    notice of facts sufficient to arouse the suspicions of a reasonable man.  Bennett v. Hibernia Bank,

4    47 Cal.2d 540, 563. Where there is no such duty, for example, because of the existence of a

5    fiduciary relationship, Plaintiff need not disprove that an earlier discovery could have been made

6    upon a diligent inquiry but need show only that he made an actual discovery of hitherto unknown

7    information within the statutory period before filing the action. Hobart v. Hobart Estate Co., 26

8    Cal.2d 412, 442 . In this case there was clearly an existence of a fiduciary relationship between

9    Plaintiff and Universal Mortgage and Sales Inc. who originated the loan. (FAC ¶36) Thus,

10   Plaintiff's failure to discover the fraud earlier may be excused.

11   Furthermore, Defendants' fraud in concealing a cause of action against them will toll the

12   statute of limitations. That tolling will last as long as a Plaintiff's reliance on the

13   misrepresentations is reasonable. Bernson v. Browning-Ferris Industries (1994) 7 Cal.4th 926,

14   931, 30 Cal.Rptr.2d 440, 873 P.2d 613; Brown v. Bleiberg (1982) 32 Cal.3d 426, 433-436, 186

15   Cal.Rptr. 228, 651 P.2d 815.). Additionally, if Plaintiff's reasonable and diligent investigation

16   discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct

17   of a wholly different sort, the discovery rule postpones accrual of the statute of limitations on the

18   newly discovered claim. Fox v. Ethicon Endo-Surgery, Inc., 27 Cal.Rptr.3d 661 (2005). 35

19   Cal.4th 797. In the present case, Plaintiff did not discover the allegations of the FAC until

20   defendants initiated the foreclosure for the Subject Property and until his loan documents were

21   reviewed by professional.

22   ///

23

24

25

26

27

28

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

## IV.    LEGAL ARGUMENT

### A. Plaintiff's Complaint Properly States a Claim for Civil Code §2923.5.

Plaintiff's first cause of action arises under the Perata Mortgage Relief Act, Civil Code §2923.5, which was designed to slow down the foreclosure process and ensure that borrowers have an opportunity to discuss foreclosure alternatives with their servicers at a time prior to instigation of Non-Judicial foreclosure, thereby increasing the likelihood of resolutions that eliminate the need for foreclosure and its accompanying disastrous effects on society in general, and home-owning families in particular. The Act imposes affirmative duties and responsibilities on lenders to assess a borrower's financial situation, explore options to avoid foreclosure, advise borrowers of their right to a meeting within fourteen (14) days, and provide them with the toll free HUD number to locate a loan counselor so that they can understand all the options to avoid foreclosure, *before* the lender or its agents can record an Notice of Default ("NOD"). Defendant's argue that Plaintiff has already received the benefits of Civil Code Section 2923.5 because she had authorized counsel to communicate on her behalf, which is per se compliance with Civil Code Section 2923.5. This implication however is erroneous. Defendant's filed the Notice of Default (NOD) on February 10, 2012, three months prior to Plaintiff retaining counsel. Therefore, at the time of filing of the Notice of Default (NOD), Plaintiff was not represented by counsel. Ergo, Defendant's argument that the "contact" condition was satisfied is false. Moreover, Defendants failed to satisfy the very requirement upon which they basing their argument as no contact was initiated prior to filing the Notice of Default (NOD). Should the court find that Plaintiff's allegations are insufficient, Plaintiff hereby respectfully requests leave to amend their cause of action for violation of Civil Code §2923.5.

## 2. __Civil Code__ §2923.5 is NOT Preempted by the National Banking Act.

Defendant's position rests primarily on preemption,, an important Constitutional doctrine that draws its force from the Supremacy Clause of the U.S. Constitution. Preemption reflects the principle that, in the collective wisdom of Congress, the laws of several States must sometimes give way to a set of nationally uniform rules and regulations. Defendant maintains that Plaintiffs claim under Civil Code §2923.5 is preempted by the some amalgamation of the National Bank Act (the "NBA") and the regulations promulgated thereunder by the Office of the Comptroller of the Currency (the "OCC"). However, Defendants preemption argument is mistaken and incorrect.

### A.  General Principles Governing Federal Preemption.

The Supreme Court has recently reemphasized "two cornerstones" of its preemption jurisprudence. Wyeth v. Levine, 129 S. Ct. 1187, 1194 (2009). First, "the purpose of Congress is the ultimate touchstone in every preemption case." *Id.* (internal quotation marks omitted). Although the text of the statute being interpreted is always the best evidence of Congress' purpose, the overall structure and purpose of a statute can also demonstrate Congress' intent to preempt state law. Medtronic, Inc. v. Lohr, 518 U.S. 470, 486 (1996). Second, the Supreme Court has instructed courts considering federal preemption to assume that "the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." Wyeth, 129 S. Ct. at 1194-95. That is because federal courts' "respect for the States as 'independent sovereigns. The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl.2.

in our federal system' leads us to assume that 'Congress does not cavalierly preempt state-law

causes of action.'" *Id.* at 1195 n. 3 (quoting Lohr, 518 U.S. at 485). The presumption against preemption is especially strong where preemption would apply to a "field which the States have traditionally occupied, such as protecting the health and safety of their citizens." Anderson v. Sara Lee Corp., 508 F.3d 181, 192 (4th Cir. 2007). In Wyeth, the Supreme Court expressly reiterated that the presumption against federal preemption applies even in those areas long occupied by federal regulation, because the presumption against preemption "accounts for the historic presence of state law," and is not dependent on the absence of federal regulation. Wyeth, 129 S. Ct. at 1195 n.3 (rejecting the argument that the presumption was inapplicable "because the Federal Government has regulated drug labeling for more than a century"). Thus, the presumption against preemption has full force here — even though the federal government has regulated national banks for more than a century — because the doctrine would displace State consumer-protection statutes, which fit squarely within the States' traditional police powers to protect the well being of their own citizens. Rice v. Sante Fe Elevator Corp. 331 U.S. 218, 230 (1947); Gen. Motors Corp. v. Abrams 897 F.2d 34, 42-43 (2d Cir. 1990). ("Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area.").

Moreover, the presumption against preemption is amplified in certain other circumstances.. The presumption against preemption would not hold where the States have attempted to directly regulate national banking itself, as opposed to consumer protection writ large, because the regulation of *national banks* — distinguished from the protection of state consumers through generally applicable legislation — is not a field traditionally occupied by the States. Cf. Nat'l City Bank of Ind. v. Turnbaugh 463 F.3d 325, 330-31 (4th Cir. 2006). Additionally, the presumption against preemption is "stronger still against preemption of state remedies . . . when no federal remedy exists." *See Anderson*, 508 F.3d at 192 (internal quotation

marks omitted). In sum, in every preemption case, the court must identify some concrete

evidence demonstrating that "the clear and manifest purpose of Congress" was to override state

law. Cipollone v. Liggett Grp., Inc. 505 U.S. 504, 516 (1992).

### B.  Preemption by Regulation.

As explained above, federal preemption can be implicated even where a statute is silent

as to preemption. That concept often arises when an agency has spoken to the issue of

preemption through the rulemaking process, an area of the law to which the Supreme Court

recently brought some much-needed clarity. Wyeth v. Levine 129 S. Ct. 1187, 1200-04 (2009).

In Wyeth, the Court articulated the precise level of deference that courts should apply to an

administrative agency's views on preemption.

The Wyeth Court outlined two distinct scenarios. The first arises where an "agency

regulation with the force of law" preempts state law. (Hillsborough, 471 U.S.

at 713). Where that is the case, courts are to conduct their "own conflict [preemption]

determination, relying on the substance of state and federal law and not on agency proclamations

of preemption."*Id.* at 1200-01. The Court offered three examples of agency regulations that bear

the force of law necessary to preempt state law. (47 U.S.C. §§ 253(a), (d) (2000); 30 U.S.C.

§ 1254(g) (2006); 49 U.S.C. § 5125(d) (2000)). What is notable about these statutory provisions

is that, unlike the NBA, each expressly mentions preemption. 47 U.S.C. § 253(d) (giving the

FCC the power to "preempt the enforcement" of any inconsistent state or local requirement).

Notably, although Congress conferred explicit rulemaking authority on the OCC in multiple

portions of the NBA, Congress did not confer any *preemptive* rulemaking authority on the OCC.

Accordingly, the circumstances here do not fit within *Wyeth's* first scenario.

In the second scenario outlined in Wyeth, a court is faced with "an agency's mere assertion

that state law is an obstacle to achieving its statutory objectives." 129 S. Ct. at 1201. The

question presented in *Wyeth* was what weight to give to the agency's views in that context. The Court explained that it had never deferred to an "agency's *conclusion* that state law is preempted," but rather had only "attended to an agency's explanation of how state law affects the regulatory scheme."*Id.*

The Court summarized the weight to be given to an agency's views on preemption as follows:  While agencies have no special authority to pronounce on preemption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness. United States v. Mead Corp.  533 U.S. 218, 234-37 (2001); Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).*Id.*  As explained below, the OCC's preemption regulation represents the agency's attempt to describe how various categories of state law stand as an obstacle to the purposes and objectives embodied in the NBA. Given that context, therefore, it is only appropriate to accord the OCC's preemption analysis Skidmore deference. *See* Wyeth, 129 S. Ct. 1187, 1200-04 (2009).

### C. Preemption Under the NBA and the OCC Regulations.

Since the early years of law, the Supreme Court has recognized that federal law pertaining to national banking necessarily supersedes conflicting state law. McCulloch v. Maryland  4 Wheat. 316 (1819). Although the original national bank at issue in McCulloch was short-lived, the concept reemerged and Congress enacted the NBA in 1864. Watters v. Wachovia Bank, N.A.  550 U.S. 1, 10 (2007).

**The NBA contains no express preemption provision.** Instead, the NBA provides national banks with several broad powers and vests the OCC with the power to oversee national

banks. Pursuant to that framework, federal courts have long recognized that Congress' purpose in enacting the NBA was to "shield national banking from unduly burdensome and duplicative state regulation." *Id.* at 11. Thus, national banks "are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the banking institution.

From the circumstances presented here, *i.e.*, where the court is faced with the OCC's declaration of preemption in the context of statutory silence. *See id.* at 2732 (Thomas, J., concurring in part and dissenting in part) ("The preemption of state enforcement authority [under § 484(a)] . . . thus follows from the statute itself — not agency action."); *see also* William Funk, *Judicial Deference and Regulatory Preemption by Federal Agencies*, 84 Tul. L. Rev. 1233, 1242 (2010) (distinguishing between the case where a "statute grants the agency substantive rulemaking authority and contains an express preemption provision applicable to those regulations," and the situation in which a "statute grants to the agency substantive rulemaking authority but without an applicable express preemption provision").

**Technically speaking, "the NBA" only refers to the original act of 1864.** *See* 12 U.S.C. § 38. In other words, the States may "regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers." *Id.* When, by contrast, state action "significantly impair[s] the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way." *Id.* Since its earliest formulation, the NBA has vested national banks with "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 Seventh. Congress did not, however, initially confer the unlimited power to engage in residential real estate lending on national banks. Although Congress gradually expanded the limited real estate lending powers of national banks over time, it was not until the enactment of the Garn-St.

Germain Depository Institutions Act of 1982 that national banks first enjoyed the broad power to engage in real estate lending. *See* Pub. L. No. 97-320, Title VIII, § 403, 96 Stat. 1510-11 (codified at 12 U.S.C. § 371(a)). To complement the broad powers granted to national banks, Congress conferred equally broad rulemaking authority on the OCC, primarily in §371(a) itself, which subjects national bank real estate lending to such "restrictions and requirements" as the OCC shall prescribe. Furthermore, the NBA confers explicit rulemaking authority on the OCC "to prescribe rules and regulations to national banks.

It is undisputed here that the mortgage servicing business of Defendant WELLS FARGO, is treated as a national bank for purposes of the NBA and the OCC's implementing regulations. <u>Watters</u>, 550 U.S. at 21. And in yet another portion of the statute, Congress directed the appropriate federal banking agencies (including the OCC) to adopt uniform regulations governing real estate lending. *See* 12 U.S.C. § 1828(*o*). Of critical importance, however, is that none of these various statutory provisions mentions — or even directly hints at —preemption.

Nevertheless, conflict preemption has always been ensconced in the NBA's regulatory scheme, because the NBA's statutory grants of authority, whether specifically enumerated or merely incidental to other powers, have been universally understood as not being "limited by, but rather ordinarily preempting, contrary state law." <u>Barnett Bank of Marion Cnty., N.A. v. Nelson</u>, 517 U.S.25, 32 (1996). Thus, when the OCC first promulgated a distinct preemption regulation in 1984, it was not promulgating a wholly new preemption provision, but rather was attempting to summarize and distill existing conflict preemption precedent. *See* 12 C.F.R. § 34.2 (1984); Real Estate Lending by National Banks, 48 Fed. Reg. 40,698, 40,700 (Sept. 9, 1983).

By 1996, the OCC had further clarified its preemption analysis, but it continued to emphasize that it was simply applying existing principles of conflict preemption. In fact, the

OCC's preemption regulation noted that the agency would "apply recognized principles of Federal preemption in considering whether State laws apply to other aspects of real estate lending by national banks." 12 C.F.R. § 34.4(b) (1997).

In its initial preemption regulation, the OCC explained that national banks could engage in real estate lending, "without regard to state law limitations" regarding five specific aspects of the lending process: the amount of a loan in relation to the appraised value of the real estate; the repayment schedule; the term to maturity of the loan; the aggregate amount of funds which could be loaned upon the security of real estate, and; the covenants and restrictions which must be contained in a lease to qualify the leasehold as acceptable security for a real estate loan. *See* 12 C.F.R. §34.23(a) (1984). Effective February 12, 2004, the OCC promulgated the current version of the preemption regulation, which provides that "state laws that obstruct, impair, or condition a national bank's ability to fully exercise its federally authorized real estate lending powers do not apply to national banks." 12 C.F.R. § 34.4(a) (2010). The regulation states that national banks may make real estate loans "without regard to state law limitations concerning" fourteen categories of law. *Id.* § 34.4(a). One of those subject areas covering "[p]rocessing, origination, servicing, sale or purchase of, or investment or participation, in mortgages," is at issue here. *Id.* § 34.4(a)(10). The regulation also sets forth a savings clause, stipulating that state laws on certain enumerated subjects are "not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent they only incidentally affect the exercise of national banks' real estate lending powers." *Id.* § 34.4(b). Included on § 34.4(b)'s list of non-preempted areas are state laws on contracts, torts, criminal law, and "[a]ny other law the effect of which the OCC determines to be incidental to the real estate lending operations of national banks or otherwise consistent with the powers and purposes set out in § 34.3(a)." *Id.* § 34.4(b)(9)

**There is another statute and regulatory framework — the Home Owners' Loan Act**

**of 1993 ("HOLA")** and the regulations promulgated there under by the Office of Thrift Supervision (the "OTS") — that comes up with some frequency in cases arising from real estate lending. HOLA and the OTS regulations govern federally regulated savings and loans, also known as thrifts, but they do not apply to national banks.

**Judicial opinions considering NBA and OCC preemption often borrow from the OTS's preemption regulation because it is similar in many respects to the OCC's regulation.** Lomax v. Bank of Am., N.A.  435 B.R. 362, 369-70 (N.D. W. Va. 2010); Frye v. Bank of Am., N.A., No: 3:10-cv-47, 2010 WL 3244879, at *5 (N.D. W. Va. Aug. 16, 2010). Significantly, the OTS's preemption regulation and many of the authorities construing that regulation and HOLA preemption arose before the Supreme Court clarified in *Wyeth* the level of deference to be applied to agency views on preemption. Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta  458 U.S. 141, 153-54 (1982) (describing the preemptive effect of Federal Regulations. Moreover, not only are the OTS regulations and the authorities interpreting those regulations predicated on an entirely different statute, but there are also two critical differences between the OCC and OTS preemption regulations.

First, the OTS has "occupied the field" of savings and loan real estate lending, whereas the OCC has not. *Compare* 12 C.F.R. § 560.2(a)(2010), *with* 12 C.F.R. § 34.4 (2010); Bank of Am. v. City & Cnty. of San Francisco 309 F.3d 551, 560 (9th Cir. 2002). ("[T]he regulation of federal saving associations by the OTS is so pervasive as to leave no room for state regulatory control."

Second, the OTS regulation is worded differently than the OCC regulation, as, for example, the OTS's preemption regulation exempts broader categories of state laws. *Compare* 12 C.F.R. § 560.2(c)(1) (excluding from preemption "contract and commercial law"), *with id.* § 34.4(b)(1) (noting that state law on "contracts" apply to national banks).

### D.  Application to Plaintiff.

**Defendant argues that express preemption is involved, whereas Plaintiff never mentions the types of preemption.** Based on the history outlined above of the NBA and the OCC's promulgation of preemption regulations there under, all the OCC set out to do in adopting § 34.4 was to codify the principles of NBA conflict preemption that had percolated through the federal courts over several decades. That only conflict preemption applies to national banking is illustrated by three additional points. First, the NBA has always lacked an express preemption provision, but the notion of preemption in this area harkens back to the days of <u>McCulloch v. Maryland</u>, 4 Wheat. 316 (1819), long before the OCC first drafted a single preemption regulation. This history indicates that something other than express preemption must be at work. <u>Davis v. Elmira Sav. Bank</u>, 161 U.S.

Defendants rely on a Supreme Court case to buttress its conclusory preemption argument, see <u>Watters, 550 U.S. at 11,</u>  however in the Supreme Court's seminal decision on NBA preemption, the Court chose not to emphasize §34.4 or any other OCC regulation, but instead focused on the actual text of the NBA and the long line of precedents construing its provisions. Watters, 550 U.S. at 11 (applying the rhetoric of conflict preemption in observing that national banks are bound by state laws that "do not conflict with the letter or the general purposes of the NBA").

DEFENDANT offers very little to support its obstacle preemption analysis. It relies heavily on those cases construing or borrowing from HOLA and OTS preemption. **DEFENDANTS omit any discussion of the proper standard of deference to be applied to the OCC's preemption analysis, taking instead the OCC's preemption provision at face value, as if it was enacted by a bicameral Congress and presented to the President for**

1  **signature.** It is unclear whether the OCC would even maintain, if given the opportunity to do so,

2  that the NBA preempts the plaintiff's claims. Put simply, nothing in the text or inherent in the

3  purposes of the NBA demonstrates Congress' intent to displace state consumer-protection laws

4  of general applicability. Moreover, that has never been the view of those courts that have

5  interpreted the NBA. *See Watters*, 550 U.S. at 11 **(explaining that national banks "are subject**

6  **to state laws of general application" that do not conflict with the NBA).** In short, the

7  OCC's regulation may be a helpful tool in distilling 150 years' worth of NBA preemption

8  jurisprudence, it is not the actual stuff from which conflict preemption arises.

9

10     Adding yet another layer of complexity to this issue, a 1994 amendment to the NBA

11  requires the OCC "to jump through additional procedural hoops (specifically, notice and

12  comment, even for opinion letters and interpretive rules)" before preempting state law. *Watters*,

13  550 U.S. at 39 n. 22 (Stevens, J., dissenting); *see* 12 U.S.C. § 43(a). In particular, § 43(a)

14  requires the OCC to publish in the Federal Register "a description of each State law" that it is

15  considering preempting.12 U.S.C. § 43(a)(1). As there is no indication that the OCC ever took

16  that step with respect to the WVCCPA provisions implicated here, it is even more doubtful that

17  the OCC's regulation could possibly have any formal preemptive effect.

18

19     The intent of Congress, as best demonstrated by the text of the NBA, demonstrates

20  significant federal regulatory objective at play that would merit displacing

21  the generally applicable state consumer-protection claims presented in the Complaint. It is

22  apparent that even if DEFENDANTS must comply with Civil Code §2923.5

23  (as every bank doing business in California and United States must also do), DEFENDANTS

24  will remain free to engage in the federally regulated and sanctioned business of mortgage

25  servicing. Obstacle preemption is not triggered merely because Civil Code §2923.5 broad statute

26

27

28

happens to ensnare certain practices of national banks. Most significantly, despite DEFENDANTS's statement that the plaintiff's Civil Code §2923.5 claims "implicate" its mortgage servicing business, DEFENDANTS have not adequately explained how complying with the Code provisions at issue here would disrupt the workings of that business. **Forcing DEFENDANTS to comply with the code provisions identified in the Complaint will not stand as an obstacle to the significant regulatory objectives underlying the NBA and the relevant OCC regulations — allowing national banks and their operating subsidiaries to engage in mortgage servicing free from unduly burdensome state regulation.**

As discussed above, DEFENDANTS were required in this case to rebut the basic assumption that Congress does not cavalierly displace the States' protection of their citizens through generally applicable consumer-protection statutes. The presumption against preemption is fortified in this case because no federal remedy exists for the plaintiffs in these circumstances. DEFENDANTS have fallen far short of rebutting that presumption. **The Plaintiff's Causes of Action are not an obstacle to the policies and purposes underlying the federal regulation of national banks.**

As such, the plaintiff's violation of Civil Code §2923.5 claims are not preempted and DEFENDANTS motion should be denied. Should the court find that Plaintiffs claims are insufficient Plaintiff hereby requests leave to amend.

### 3. Plaintiff's Complaint Properly States a Claim For <u>Business and Professions Code §17200</u>

Unfair competition is defined in <u>Business and Professions Code</u> §17200 as encompassing any one of the following five types of business "wrongs":[1] (1) an "unlawful" business act or practice;

---

[1] The full text of <u>Business and Professions Code</u> §17200 reads as follows:
   As used in this chapter, unfair competition shall mean and include any
   unlawful, unfair or fraudulent business act or practice and unfair,
   deceptive, untrue or misleading advertising and any act prohibited by
   Chapter 1 (commencing with 17500) of Part 3 of Division 7 of the

(2) an "unfair" business act or practice; (3) a "fraudulent" business act or practice; (4) "unfair, deceptive, untrue or misleading advertising"; and (5) any act prohibited by Business and Professions Code §§17500-17577.5.

The definitions in Business and Professions Code §17200 are disjunctive.[1] Each of these five "wrongs" operates independently from the others. "[I]n other words, a practice is prohibited as "unfair" or "fraudulent" even if not "unlawful" and vice versa." *Id.*

Business and Professions Code §17200 proscribes unlawful as well as unfair business practices, and Plaintiff has pled facts showing Defendants' unlawful foreclosure against them. The "unfair" prong of Business and Professions Code §17200 intentionally provides courts with broad discretion to prohibit new schemes to defraud. Motors, Inc. v. Times-Mirror Co. (1980) 102 Cal. App. 3d 735, 740.

An unlawful business practice or act is "unfair" when it "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. People v. Casa Blanca Convalescent Homes, Inc. (1984) 159 Cal. App. 3d 509, 530. "[T]he court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." State Farm Fire & Casualty Co. v. Superior Court (1996) 45 Cal. App. 4th 1093, 1104. "[A] practice may be deemed unfair even if not specifically proscribed by some other law." Korea Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal.4th 1134, 1143 [131 Cal.Rptr.2d 29, 63 P.3d 937].

"A claim based upon the fraudulent business practice prong of the UCL is 'distinct from common law fraud. "A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages. None of these elements are required to state a claim for …relief" under the UCL. [Citations.] This distinction reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's

---

Business and Professions Code.

[1] See State Farm Fire & Casualty Company v. Superior Court, 45 Cal. App. 4th 1093, 1102 (1996)

damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices.'" (Ibid.) A fraudulent business practice "may be accurate on some level, but will nonetheless tend to mislead or deceive... A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under the UCL." McKell v. Washington Mutual, Inc. (2006) 142 Cal.App.4th 1457, 1471 [49 Cal.Rptr.3d 227]

In regards to Defendant's unlawful and fraudulent business activities, the COMPLAINT adequately alleges common law fraud and negligent misrepresentation causes action. In their UCL claim, Plaintiffs rely both on the concept of fraud and loan servicing alleging "unlawful" and "unfair" behavior, as well as, "fraudulent business" practices. As discussed in the COMPLAINT, Defendant's misrepresentations and concealment of material terms of the loan constitutes unlawful act and it is sufficient to satisfy the "unlawful" prong of the UCL and provide Plaintiffs a right to restitutionary relief for the misrepresentations that occurred as part of loan origination and transferred into assignment and loan servicing.

Defendant's unfair business acts and practices include but are not limited to: misrepresentation of material terms of the loan, monthly payments and altered the loan documents. Thus, Plaintiffs have properly alleged that Defendant was engaged in deceptive, unfair and fraudulent conduct under both the "unlawful" and "unfairness" prongs of Business and Professions Code §17200.

Furthermore, Plaintiffs have standing because it is clear that the COMPLAINT alleges that Plaintiffs have lost substantial amount of money in loss of equity, higher interest rate, foreclosure fees and penalties. Should the court find that Plaintiffs' allegations are insufficient, Plaintiffs hereby request leave to amend their unfair competition cause of action.

### 4. Plaintiff Properly States Claims For Fraud

Defendant argues that fraud cause of action fails because it is time barred and it is not alleged with particularity. As discussed above, the discovery rule may toll the accrual of causes of action and any contention that this action is time-barred at this stage of the pleading is misplaced.

## A. Plaintiffs Properly Alleged Fraud.

To determine if the elements of fraud have been sufficiently pleaded, the court looks to state law. Kearns v. Ford Motor Co., 567 F.3d 1120, 1126 (9th Cir. 2009). To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct that is alleged to constitute the fraud claim so that they can defend against the claim and not just deny that they have done anything wrong. Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001). Rule 9(b) requires plaintiffs to differentiate between the conduct of each defendant and "inform each defendant separately of the allegations surrounding his alleged participation in the fraud." Swartz v. KPMG LLP, 476 F.3d 756, 764-65 (9th. Cir. 2007).

"[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." Boschma v. Home Loan Center, Inc., (2011) 198 Cal. App.4th 230, 248. (Boschma)

Although Plaintiffs did plead each and every element of fraud in the COMPLAINT the alleged fraudulent misrepresentations and omissions at issue, the enhanced pleading burden of a fraud claim is met by the attachment of the relevant loan documents. Boschma at 249. Here, Plaintiffs' evidence is the mortgage instrument, which provides specific content of the allegedly false representations related to material terms of the loan. "While the precise identities of the employees responsible…are not specified in the loan instrument, defendants possess the superior knowledge of who was responsible for crafting these loan documents." Id at 249. In any event, much of what Defendant points to as lacking particularity is the question of Defendant's intent, information exclusively within its control which subsequently lessens the particularity pleading requirement for fraud. Committee on Children's Television, Inc. v. General Foods Corps. 35 Cal.3d 197, 217 (1983).

In addition, actual fraud occurs when a party to the contract intends to deceive another party to the contract or to induce another party to enter into the contract on the basis of a promise made without any intention of performing it or any other deceitful act. Benson v. Hamilton, 126 Cal. App. 331, 334 (1932). "A promise to do something necessarily implies the intention to perform, and where such an intention is absent, there is an implied misrepresentation of fact, which is actionable fraud." Joanaco Projects v. Nixon & Tierney Constr. Co., 248 Cal.App.2d 821, 831 (1967) (emphasis in original). Accordingly, Defendant's or its agents promise that they are capable of performing their obligations, or one which induces Plaintiff to contract with Defendant, is a "duty that gives rise to tort liability completely independent of the contract." Erlich v. Menezes, 21 Cal.4th 543, 552 (1999) (acknowledging the blurred distinctions between tort and contract claims).

"Actual fraud consists, among other things, of "[t]he suppression of that which is true, by one having knowledge or belief of the fact" or "[a]ny other act fitted to deceive." (Civil Code §1572)

The misrepresentations between Plaintiffs and Wells Fargo are clear and adequately alleged throughout COMPLAINT. Here, Plaintiffs allege that Defendant concealed or suppressed material facts about material terms of the loan and made false representations related to interest rate, negative amortization and monthly payments.

Finally, Defendant had a common law duty to avoid making partial, misleading representations that effectively concealed material facts. Randi W. v. Muroc Joint Unified School Dist. (1997) 14 Cal.4th 1066, 1082-1084; LiMandri v. Judkins (1997) 52 Cal.App.4th 326, 336. Accordingly, Plaintiffs have alleged sufficient facts to establish claims for fraud and negligent misrepresentation

### 5. Plaintiffs' COMPLAINT Properly States A Claim For Declaratory Relief

The COMPLAINT states facts showing that there is an actual dispute regarding the validity foreclosure on the Subject Property. Defendant claims that the COMPLAINT fails to allege that there is an actual or present controversy. However, the COMPLAINT clearly alleges that "An actual controversy has arisen and now exists between Plaintiffs and Defendant

1   regarding their respective rights and duties." The court has broad discretion to grant declaratory

2   relief. See Schessler v. Keck (1954) 125 Cal.App.2d 827. Plaintiffs seek a declaratory

3   determination from this court invalidating defendant's contentions herein and declaring her title

4   to the Subject Property. See Washington Mutual Bank v. Blechman (2007) 157 Cal.App.4th 662,

5   668. Thus, the COMPLAINT alleges facts sufficient to seek declaratory relief and Defendant's

6   motion to dismiss should be denied.

### V. CONCLUSION

Based on the above, Plaintiff respectfully requests that Defendants' Motion to Dismiss be

denied or provide Plaintiff with leave to amend.

Dated: January 28, 2013                           JP Law

                                                  Laura Furuta, Esq.
                                                  Attorney for Plaintiff